MAHONING INV. CO. v. UNITED STATES.

ROCHESTER & PITTSBURGH COAL & IRON CO. v. SAME.

Nos. M—405, M—406.

Court of Claims.

June 5, 1933.

Howe P. Cochran, of Washington, D. C. (William N. Wood, Frederick S. Winston, and C. Leo De Orsey, all of Washington, D. C., on the brief), for plaintiffs.

George H. Foster and W. W. Scott, both of Washington, D. C., for the United States.

Before GREEN, WHALEY, WILLIAMS, and LITTLETON, Judges.

GREEN, Judge.

The two cases above entitled have been submitted together upon the same evidence but upon different theories, the contention of the plaintiffs being that one or the other is entitled to recover the amount for which each brings suit, namely, $250,889.42 and interest, amounting to nearly half a million dollars.

The facts are undisputed. The two companies are affiliated, the Mahoning Investment Company being the parent company and owning all of the stock of the Rochester & Pittsburgh Coal & Iron Company. The tax involved is for 1918. On June 13, 1919, the investment company filed a consolidated return for itself and affiliates. The coal company filed only the so-called tentative return on March 15th. The return filed by the investment company showed that the company itself had no taxable income for the year 1918 and that the great bulk of the consolidated income was income of the coal company. The total tax for the group, according to the return, was $1,193,666.06, of which amount $1,191,786.74, being the tax of the coal company, was paid by it and the balance of the tax was paid by two other affiliated companies. On January 16, 1924, the investment company was requested to furnish waivers for itself and affiliates for the year 1918, which was accordingly done and the period for assessment and collection for 1918 against the respective companies was extended to June 13, 1925.

On February 12, 1925, the Commissioner sent a "thirty day" letter to the investment company advising it of a proposed deficiency for 1918 in the sum of $250,889.42. The letter showed that this proposed deficiency resulted from changes made by the Commissioner in the amount of income of the coal company. Prior to this letter being sent out, a notice of a proposed deficiency somewhat larger had been sent to the investment company. The investment company protested against the proposed deficiency on behalf of itself and affiliates and a hearing was requested and granted with the result it was determined that the deficiency should be reduced to the amount disclosed in the letter of February 12, 1925. All of the matters pertaining to the taxes of the consolidated group of corporations and each of the affiliates were in charge of one Heath S. Clark, who was attorney in fact for each of the companies and duly authorized to act for each of them in these matters. He knew that the deficiency arose out of business of the coal company. All of the business between the government and these companies was dealt with through the Mahoning Investment Company, which at no time requested the Commissioner to deal directly with any of its subsidiaries but on the contrary acted for and in behalf of all of its subsidiaries in connection with the taxes involved herein.

On April 14, 1925, the Commissioner of Internal Revenue made an assessment against the Mahoning Investment Company for additional taxes in the amount of $250,889.42 for the calendar year 1918, and on June 5, 1925, said Heath S. Clark wrote the collector with reference to some taxes for which notice and demand had been given May 28, 1925. This letter was headed: "The Rochester & Pittsburgh Coal & Iron Co., Legal Department."

In this letter he stated:

"The same taxpayer has had assessed against it for the year 1918 an additional income and profits tax in the amount of $250,889.42, to which assessment the taxpayer has agreed. To date no notice and demand for same has been received and the taxpayer is willing to make prompt payment upon receipt of same."

He also referred to the fact that letters with reference to these taxes were addressed to the Mahoning Investment Company. The coal company never received any notice of final determination of the deficiency, nor was any notice of assessment or demand sent to it in its own name, nor did it receive any six-

ty day letter addressed to it advising it of the 1918 deficiency. There was no agreement between the coal company and the investment company by which the investment company agreed to assume and pay any taxes assessed against the coal company, nor any arrangement whereby taxes owed by the coal company should be assessed against the investment company, nor was any assessment of the additional tax of $250,889.42 ever made against the coal company but notice and demand was made for the payment of the additional tax on the investment company prior to July 17, 1925, and on the date last named the assessment was paid. The manner of payment was as follows: The fiscal agents of the coal company were requested by that company to pay the tax and charge the amount to the coal company. This was done and a receipt of the collector was issued in the name of the investment company. Payment was made upon advice from Clark that it was the coal company's liability and, as shown above, it was well understood that the assessment, notice, and demand had been made against the investment company. Both the investment company and the coal company not only acquiesced in the manner in which the tax proceedings were conducted but gave the government to understand that each agreed thereto. On behalf of the coal company, as shown above, it was expressly stated that the taxpayer agreed thereto and that when notice was given and demand made the coal company would promptly pay the tax, and it was in response to this advice and in accordance therewith that the government gave the notice and demand requested and in response thereto the coal company paid the tax. Subsequently and after the period of limitations had expired for making an assessment against the proper party and collecting the tax, each company filed a claim for a refund. Without stating in particular the ground of these claims, it may be said in general that the basis of each was that the assessment should have been made against the coal company, but that no such assessment was made, and under section 607 of the Revenue Act of 1928 (26 USCA § 2607) the amount so paid can be recovered back.

It should be observed that up to the time when the Commissioner made the assessment against the Mahoning Investment Company the government had assessed no tax against any of the members of the affiliated group. The record does not disclose how it happened that the deficiency assessment was made against the Mahoning Company instead of against the coal company. The only return that had been made (except the so-called tentative return of the coal company) was the consolidated return presented by the Mahoning Company on behalf of itself and the affiliated corporations. It may be that the underofficial of the government who attended to the matter of making the assessment thought it was proper to make the assessment against the Mahoning Company under all of the circumstances, as the law with reference to this matter seems not to have been very well understood at the time. Or, what is more likely, the manner of the assessment may have been simply an oversight. But we do not think this is material except that the conduct of the plaintiffs, acting through their attorney, was such as to render it likely that the error or oversight would not be discovered; or, if discovered, it would be considered that in view of his representations it was immaterial, for so far as the financial result was concerned it made no difference to either company which one paid the tax.

In the case of David Daube v. United States, 59 F.(2d) 842, 75 Ct. Cl. 633, in which it appeared that the plaintiff had been allowed an overassessment of a certain sum which he directed applied on the taxes of a copartnership of which he was a member, we held that he could not recover back the overpayment although it was so applied after the statute of limitations had run. The decision in the Daube Case, with reference to one division thereof, was reviewed by the Supreme Court and affirmed, 53 S. Ct. 597, 77 L. Ed. ——, but certiorari was denied upon the point with respect to which we now cite it 53 S. Ct. 403, 77 L. Ed. ——. In the case of John Muir v. United States, 3 F. Supp. 619, this day decided by this court, a similar question arose and the Daube Case was followed. The basis for these decisions is the principle that where a taxpayer has money due to him from the United States and he directs the application thereof on some other taxes than his own, the statutory provisions with reference to payments or credits upon his own taxes do not apply, provided, of course, there is a consideration for the transaction. We think that a similar principle is involved in the case at bar. The taxes in question were due and owing from the coal company although there had been no assessment thereof. The coal company so agreed in its statement to the defendant and promised to pay them if notice and demand

was made. This having been done, it remitted the necessary funds accordingly to the defendant, and the defendant made the application accordingly in accordance with directions implied from the remittance. We do not think the statutory provisions upon which the plaintiffs rely were intended to apply to such a case, but independently of this holding we think that the coal company cannot recover for other reasons which follow.

■ It must be conceded on the one hand that the government had a just claim against the plaintiff coal company, and on the other hand that it was attempting to enforce it in a manner for which there was no authority in law, for the assessment should have been made against the coal company instead of the investment company. Under these circumstances the coal company, with full knowledge of the error, gave the defendant's officials to understand that the method used to enforce the tax was entirely acceptable to it, that it agreed thereto, and that if the government would proceed to the end on the same lines by giving notice and making a demand for the tax it would promptly pay the same, and in accordance with this agreement it did make payment. The question to be determined in the case is whether under such circumstances either of the plaintiffs can recover the amount so paid. The defendant contends that the investment company cannot recover because it did not pay the tax, and that the coal company is prevented from recovering by reason of its acquiescence and agreement in the proceedings and its promise to pay the tax upon notice and demand. The ultimate question in the case as we view it, is whether the coal company is estopped under the peculiar circumstances of the case, from recovering the tax which it paid. At the outset it should be observed that mere acquiescence will not prevent a plaintiff from asserting what would ordinarily be its legal rights unless there is some element of estoppel connected therewith.

■ Some courts use the words "ratification," "acquiescence," "adoption," and "affirmance" in practically the same sense and hold that an estoppel may be based upon any of these matters and in some instances on a waiver. Others hold that there can be no ratification except in the case of an agency of some nature, and an estoppel by acquiescence is sometimes referred to as a quasi estoppel, that is, as one in which a situation is created which is analogous to estoppel and has the same effect as an estoppel in pais, but it is generally held that all the rules which apply to estoppel in pais are not applicable to an equitable estoppel. For example, the element of fraud does not necessarily enter into an equitable estoppel, and a party who has no intent to defraud may nevertheless be estopped. In fact the courts have not been harmonious as to the principles upon which an equitable estoppel may be based, but the weight of authority is agreed in holding that it exists under certain circumstances to which reference will hereinafter be made. The general rule is as follows:

"Equitable estoppel, in the modern sense, arises from the conduct of a party, using that word in its broadest meaning as including his spoken or written words, his positive acts, and his silence or negative omission to do anything. Its foundation is justice and good conscience." 2 Pom. Eq. Jur., § 802.

■ "The doctrine seems to be well established by authority that the conduct and admissions of a party operate against him in the nature of an estoppel, wherever, in good conscience and honest dealing, he ought not to be permitted to gainsay them." Stevens v. Dennett, 51 N. H. 324.

In Dickerson v. Colgrove, 100 U. S. 578, 580, 25 L. Ed. 618, it is said: "The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is *sternly forbidden*. It involves fraud and falsehood, and the law abhors both." (Italics ours.)

And further: "There is no rule more necessary to enforce good faith than that which compels a person to abstain from asserting claims which he has induced others to suppose he would not rely on."

■ So also it is well settled that it is not necessary that acts or declarations should be made with the intent to mislead in order to work an estoppel, but it is sufficient if they were calculated to and did in fact mislead. See Marine Iron Works v. Wiess (C. C. A.) 148 F. 145.

In Holt v. New England Tel. & Tel. Co., 110 Me. 10, 12, 85 A. 159, it is said: "Estoppel is a rule of law which prevents a party from asserting his rights when he has so conducted himself that it would be contrary to equity and good conscience for him to allege and prove the truth."

The authorities agree that acts, conduct, or declarations of the party estopped must be such as to mislead the other party to his detriment. In the case at bar the defendant's officials were not misled as to the corporation against which the assessment should have been made, but the ordinary and natural result of the statements made by the attorney for the plaintiffs would be to cause defendant's officials to believe that the plaintiff coal company fully accepted the method of procedure with reference to its taxes, and that after demand and notice a payment would be made which would constitute a final settlement. In this respect the statements contained in the letter were very misleading. In most of the cases of estoppel by acquiescence it will be found that there is no direct proof that the party claiming the estoppel was misled, but this fact is found as a natural and ordinary inference from all of the circumstances of the case, and we have made such a finding in the case now before us.

It has sometimes been held that it must be shown that the party claiming the estoppel has changed his position in consequence of the acts or statements of the other party, but where acquiescence is the ground of the estoppel there is usually no occasion for a change of the position of the party claiming the estoppel and no change is made. All that is shown in these cases is that the acts of the party estopped were such as to mislead the party claiming the estoppel to continue in the course already begun, believing the same to be acceptable to the party estopped. This, we think, has been shown in this case and we have accordingly so found. As has already been stated, when the coal company received information that a deficiency assessment had been made against the investment company, which their attorney understood was on account of profits made by the coal company, the coal company thereupon through its attorney advised the government that it agreed to the assessment and treated it as one made against itself, stating that the tax would be paid on notice and demand. The government officials would naturally conclude that procedure on the same lines would be acceptable to the coal company, and accordingly the notice and demand was given the investment company. This again was accepted, acquiesced in by the coal company, and it made payment of the tax accordingly. We think that when the defendant received the letter written by the coal company's attorney its officials had the right to believe that the case needed no further attention than to give the notice and demand, that they were induced to proceed as they did by the statements made in the letter, and that the coal company is now estopped from asserting that these proceedings were illegal or insufficient to make it liable. If we permit the coal company now to defeat the tax by asserting that the proceedings with which it agreed and pronounced to be satisfactory to be unlawful, we permit it to directly contradict what it had heretofore asserted and given the defendant's officials to understand.

In this connection it should be said that it is evident from a reading of the letter written by the attorney for the coal company that he observed the error which had been made in the assessment, but we think it quite likely that he concluded it was entirely immaterial and that it was not worth while to call the attention of the government to this fact. At the time when he wrote the letter the tax was due and payable, but he seems to have concluded that it was better to have it paid by the right party, although in a financial way it made no difference which company paid the tax as the investment company owned all the stock of the coal company. But it is not necessary that it should be found that he intended to mislead the defendant's officials. It is sufficient, as we think, that he pursued such a course as naturally would and did mislead them to the prejudice of the defendant. This prejudice is apparent for the statute of limitations with reference to the making of the assessment had not then expired.

The doctrine of equitable estoppel, or more properly as we think quasi estoppel, is gradually being extended by the modern courts to prevent a wrong being done "wherever, in good conscience and honest dealing," a party ought not to be permitted to repudiate his previous statements and declarations. The case of Rothschild v. Title Guarantee & Trust Co., 204 N. Y. 458, 97 N. E. 879, 880, 41 L. R. A. (N. S.) 740, is an illustration of how far this principle has been carried in a case closely parallel to the one now before this court. It appeared therein that the plaintiffs were executrices of the will of Caroline Strauss and brought suit to have a mortgage purporting to have been executed to the defendant canceled and set aside. The mortgage was in fact a forgery, but its execution had been effected by the son of Caroline Strauss who also received from the defendant two checks payable to her and her husband for the amount thereof when he ne-

gotiated it. About a year after the making of the loan Caroline Strauss acquired full knowledge of how it had been obtained and that her signature had been forged to the bond and mortgage by the procurement of her son. Nevertheless, she caused to be paid out of her own money certain of the interest due thereon. The New York Court held that no duty was cast upon Caroline Strauss to repudiate the mortgage when she first heard of it and that if she had merely kept silent with reference to it the mortgage could not be enforced; but that the payments of interest by her worked a different result, for if the defendant had been conscious of the truth it might have availed itself of certain remedies and that—

"Caroline could not by act or declaration diminish or thwart that right and not incur responsibility. * * * She by making the payments recognized the mortgage and the lien it seemed to create as real and existing, extended their existence, and retarded or intercepted the natural growth and development of the rights and relations between the defendant and her son, and benefited her son and, presumptively, within her contemplation, herself. She could not be permitted to thereafter repudiate the mortgage. The payments of the interest made by her and their effects, and a subsequent repudiation of the mortgage by her, would be inconsistent with each other, would not be responsive to the demands of justice and good conscience, and would effect a fraudulent result. When a party with full knowledge, or with sufficient notice of his rights and of all the material facts, freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable. Vohmann v. Michel, 185 N. Y. 420, 78 N. E. 156, 113 Am. St. Rep. 921; 2 Pomeroy's Equity Jurisprudence (3d Ed.) §§ 816–821, 965."

So also in the case now before the court the plaintiff coal company owed the defendant no duty to advise it of the error that had been committed in the assessment. When, however, it saw fit to give the defendant certain information in regard to this assessment, it could not thereafter take a position which was so inconsistent with the statements which it had made as not to be responsive to the demands of justice and good conscience. As in the New York case, the relation of the parties was entirely altered. The plaintiff coal company by recognition and adoption of the proceedings gave them such effect that the collection of the tax was deferred until after the statute of limitations had run against its assessment. In the New York case above cited, the court held that the estoppel had been established, and we think if the same principles are applied in the case before the court the same result will follow.

We think the investment company was equally estopped with the coal company, for all of the correspondence on the part of the defendant was carried on through that company. But it is not necessary to make such a holding in order to deny it recovery for it paid nothing upon the tax and never treated the assessment as having been made against itself but as against the coal company. The duly authorized attorney for both companies received the letters addressed to the investment company, and the coal company was controlled by the parent company.

For the reasons above stated we think that neither of the plaintiffs in the two cases involved is entitled to recover and the respective petition of each is dismissed. It is so ordered.

BOOTH, C. J., took no part in this decision on account of illness.